# Supreme Court of Kentucky

2019-SC-0016-DG
AND
2019-SC-0211-DG


LP LOUISVILLE EAST, LLC D/B/A        APPELLANTS/CROSS-APPELLEES
SIGNATURE HEALTHCARE OF EAST
LOUISVILLE AND BRIAN MUELLER


               ON REVIEW AND CROSS-REVIEW FROM COURT OF APPEALS
V.                     NO. 2017-CA-001887
             JEFFERSON CIRCUIT COURT NO. 17-CI-003358


KENNETH R. PATTON, ADMINISTRATOR      APPELLEE/CROSS-APPELLANT
OF THE ESTATE OF TOMMY ROBERT
PATTON


## ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION


The Court hereby orders that the Opinion of the Court rendered on

August 20th, 2020, be MODIFIED, and the attached opinion is hereby

ordered substituted for the opinion originally rendered. Additionally,

Appellee's Petition for Rehearing is denied.

Minton, C.J.; Conley, Hughes, Keller, Lambert, and VanMeter, JJ.,

sitting. Nickell, J., not sitting. All concur.


ENTERED: APRIL 29, 2021.


_____
CHIEF JUSTICE

# Supreme Court of Kentucky

2019-SC-0016-DG
AND
2019-SC-0211-DG

LP LOUISVILLE EAST, LLC D/B/A      APPELLANTS/CROSS-APPELLEES
SIGNATURE HEALTHCARE OF EAST
LOUISVILLE AND BRIAN MUELLER


ON REVIEW AND CROSS-REVIEW FROM COURT OF APPEALS
V.                 NO. 2017-CA-001887
JEFFERSON CIRCUIT COURT NO. 17-CI-003358


KENNETH R. PATTON, ADMINISTRATOR      APPELLEE/CROSS-APPELLANT
OF THE ESTATE OF TOMMY ROBERT
PATTON


**OPINION OF THE COURT BY JUSTICE HUGHES**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

Kenneth R. Patton, as Administrator of the Estate of Tommy Robert Patton, initiated a negligence and wrongful death action against LP Louisville East, LLC, doing business as Signature HealthCARE of East Louisville (Signature).  Because Kenneth had signed an Arbitration Agreement at the time his father, Tommy Patton, was admitted to Signature's long-term care facility, Signature moved the circuit court to compel Kenneth to arbitrate the claims. The trial court denied the motion and the Court of Appeals affirmed in part and reversed in part.

On discretionary review of the Court of Appeals' decision, we affirm in part and reverse in part. Kenneth signed the Arbitration Agreement in both his representative and individual capacities and, consequently, we affirm the Court of Appeals' decision that the Arbitration Agreement is enforceable as to Kenneth's individual wrongful death claim. We reverse, however, the Court of Appeals' decision that the Arbitration Agreement is not enforceable as to the Estate's claims, concluding that the power of attorney which Tommy granted his son fully authorized execution of the Arbitration Agreement at issue.

**FACTUAL AND PROCEDURAL BACKGROUND**

Signature is a long-term care facility located in Louisville to which Tommy Robert Patton was admitted as a resident in early 2017. According to Kenneth R. Patton, his father was placed in Signature's care because Tommy was not able to care for himself due to physical limitations. To secure Tommy's admittance, Kenneth signed an Arbitration Agreement as Tommy's authorized representative.

The agreement is entitled "AGREEMENT TO INFORMALLY RESOLVE AND ARBITRATE ALL DISPUTES" (Arbitration Agreement), and begins with Signature's statement that it requires all new residents and/or their legal representatives to read, agree, and sign the Agreement as a condition of the applicant's admission to its facility. The Arbitration Agreement has eleven enumerated provisions, prefaced "Resident, facility, and other person signing this document understand and agree . . . ." The first provision reads, "If a dispute or legal claim of any kind (including a class or representative action or

2

claim) arises between the parties signing the agreement (collectively a dispute),” the parties will arbitrate the dispute if it cannot first be resolved informally or through mediation.  The sixth provision states, “We agree [this agreement] will be upheld and enforced against our heirs, beneficiaries, estates, estate representatives, successors, statutory wrongful death beneficiaries, and assigns.”  The eleventh provision states in part, “I understand and agree that the Resident and his/her agents, heirs, beneficiaries, estate, and assigns are intended beneficiaries of, and will be bound by, this agreement.”  Immediately before the signature block, a bolded, all-capitalized statement provides that the signee has had the opportunity to read the Arbitration Agreement, ask questions and consult an attorney; that he understands that the agreement is required for admission; and that the consent is voluntarily given.  Immediately below the signature line for the resident’s authorized representative is the notation “Resident’s Authorized Representative/Individual* Signature” and the asterisk’s explanation, “*Representative understands and agrees s/he is signing in both representative and individual capacities.”

Kenneth provided to Signature the “Durable Power of Attorney for Finance of Tommy R. Patton” (POA) designating him as Tommy’s attorney-in-fact and agent.  Article IV of the POA entitled “Powers” begins “My Agent shall have all powers of an absolute owner over my assets and liabilities, . . . including, without limitation, the following power and authority.”  The power and authority under Article IV is stated under six subheadings: A) Power relating to real property transactions; B) Power relating to banking and other

3

financial institution transactions; C) Power relating to insurance transactions; D) Power relating to estate, trust, and other beneficiary transactions; E) Power relating to claims and litigation; and F) Power relating to benefits from Social Security, Medicare, Medicaid, or other governmental programs or from military service.

As to claims and litigation, Tommy empowered his attorney-in-fact to:

1. assert and prosecute before a court or administrative agency a claim, counterclaim, or offset and defend against an individual, a legal entity, or government, including suits to recover property or other thing of value, to recover damages sustained by the principal, to eliminate or modify tax liability, or to seek an injunction, specific performance, or other relief;

. . . .

[and to]

5. submit to arbitration, settle, and propose or accept a compromise with respect to a claim or litigation;

. . . .

As to Social Security, Medicare and other governmental programs, Tommy empowered his attorney-in-fact to "prepare, file, and prosecute a claim of the principal to a benefit or assistance, financial or otherwise, to which the principal claims to be entitled, under a statute or governmental regulation" and "prosecute, defend, submit to arbitration, settle, and propose or accept a compromise with respect to any benefits the principal may be entitled to receive."

The succeeding article, Article V, entitled "Purposes" states in full: "My Agent shall have all powers as are necessary or desirable to provide for my

4

support, maintenance, health, emergencies, and urgent necessities." Consistent with the reference to "all powers" regarding "health," in Article VIII, Section I., Tommy provided: "I intend for my agent to be treated as I would be with respect to my rights regarding the use and disclosure of my individually identifiable health information or other medical records."

Shortly after Tommy's admittance to the facility, he suffered a fall which resulted in lacerations to his head. Tommy was transferred from Signature's care and he died within a few weeks. Kenneth, as Administrator of the Estate, without initiating mediation or arbitration, brought a "negligence/wrongful death" claim in Jefferson Circuit Court against Signature and Brian Mueller, identified as Signature's facility administrator (collectively "Signature").[1]

In lieu of filing an answer, Signature filed a motion to compel arbitration and stay, or alternatively, to dismiss the action on the grounds that the Arbitration Agreement was a valid and enforceable contract. Kenneth responded that the POA did not provide him with the authority to enter into the Arbitration Agreement. Kenneth also argued that the wrongful death claim, brought in his capacity as the Estate Administrator, is not subject to the Arbitration Agreement. The trial court denied Signature's motion in its entirety without issuing any findings of fact or conclusions of law.

---

[1] Signature states that the allegation that Mueller is the administrator of the Facility is factually inaccurate and that Mueller reserved the right to assert all defenses therefrom in arbitration or litigation proceedings. Signature also acknowledges, however, that the Arbitration Agreement's terms apply to disputes or claims pertaining to "agents" of the Facility, and therefore encompasses claims against an individual administrator in his or her capacity as such.

5

Pursuant to Kentucky Revised Statute (KRS) 417.220, Signature appealed the trial court's denial of its motion to compel arbitration. The Court of Appeals concluded the Arbitration Agreement is not valid or enforceable against Tommy, his Estate, or the wrongful death beneficiaries not party to the Arbitration Agreement, but further concluded that Kenneth's wrongful death claim is arbitrable because he executed the Arbitration Agreement in his individual capacity. Finally, the Court of Appeals concluded that the trial court must enter a stay of the claims not subject to arbitration pending completion of arbitration of Kenneth's wrongful death claim against Signature. This Court granted both Signature's and Kenneth's motions for discretionary review.

Signature raises the issue whether the Court of Appeals misapplied *Kindred Nursing Centers Ltd. Partnership v. Wellner*, 533 S.W.3d 189 (Ky. 2017), as well as the United States Supreme Court decision from which it was remanded, *Kindred Nursing Centers Ltd. Partnership v. Clark*, 581 U.S. ___, 135 S. Ct. 1421 (2017), when interpreting Article IV of Tommy's POA and concluding the Arbitration Agreement is not enforceable against Tommy's Estate. Applying the principles enunciated in *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 590 (Ky. 2012), we find that Article V of Tommy's POA authorized Kenneth to enter into the mandatory Arbitration Agreement when exercising his agency powers as to Tommy's "maintenance" and "health" by admitting him to a long-term care facility. We consequently reverse the Court

6

of Appeals' decision that the Arbitration Agreement is not enforceable against Tommy's Estate.[2]

As to Kenneth's primary appellate issue – whether the Court of Appeals erred by concluding that Kenneth's signature in his individual capacity on the Arbitration Agreement requires arbitration of his interest in a subsequent wrongful death recovery action – we disagree with Kenneth. We affirm the Court of Appeals' decision that Kenneth's claim is arbitrable.

Thus, we conclude that both Tommy's Estate and Kenneth's individual claims are subject to arbitration and remand this case to the trial court for further proceedings consistent with this Opinion. Due to this resolution, the Court of Appeals' conclusion that Kenneth's wrongful death claim must be arbitrated before any further action occurs in circuit court is now moot.[3]

---

[2] Signature also presents the argument that to the extent Kenneth asserts a wrongful death claim on behalf of individuals other than himself, any such claim should also be deemed subject to the Arbitration Agreement, noting that in *Ping* this Court stated that wrongful death beneficiaries "do not succeed to the decedent's dispute resolution agreements," a position Signature argues that should be viewed as preempted by the Federal Arbitration Act. Although Signature's motion for discretionary review did not set forth this argument, Signature suggests this Court should revisit *Ping* and deem it preempted by the FAA, such that any wrongful death claims asserted in this action are subject to the Arbitration Agreement. We decline Signature's invitation.

[3] Kenneth argues that the Court of Appeals erred in its ruling that all litigation must be stayed pending arbitration. Considering our ruling today, we decline further to address this issue, leaving to the trial court on remand the resolution of a possible litigation stay affecting the non-arbitrable claims asserted by parties who are not participants in this appeal.

7

I.     **The Arbitration Agreement is valid and enforceable as to Tommy Patton's Estate claim.**

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.*, and Kentucky Uniform Arbitration Act (KUAA), KRS 417.050 *et seq.*, generally favor the enforcement of arbitration agreements.[4]  *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 854 (Ky. 2004) (citations omitted).  Because arbitration is fundamentally a matter of contract, *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010), an arbitration agreement is treated as all other contracts and if the agreement is valid, it will be enforced, 9 U.S.C. § 2; KRS 417.050; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451, 457 (Ky. 2009).  Once the party seeking to enforce an agreement meets its burden of establishing with prima facie evidence a valid arbitration agreement exists, the burden shifts to the party seeking to avoid the agreement to rebut the presumption.  *Louisville Peterbilt*, 132 S.W.3d at 857 (citation omitted).  As *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.* explains, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the

---

[4] Arbitration as a means of dispute resolution in the Commonwealth dates back to at least 1799 when the drafters of Kentucky's Second Constitution included in Article VI. § 10 a duty on the part of the General Assembly to "pass such laws as shall be necessary and proper to decide differences by arbitrators."  All subsequent versions of our state constitution, continuing to the present one adopted in 1891, have contained this language, Ky. Const. § 250, and the General Assembly has fulfilled its duty by adopting the Uniform Arbitration Act, KRS 417.045 *et seq.*

construction of the contract language itself or an allegation of waiver, delay, or

a like defense to arbitrability." 460 U.S. 1, 24–25 (1983).

Both the FAA and KUAA apply to arbitration agreements for existing

disputes and disputes which may arise after the contract's formation.

9 U.S.C. § 2 states:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[5]

Similarly, KRS 417.050 reads:

A written agreement to submit any existing controversy to arbitration or a provision in written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon such grounds as exist at law for the revocation of any contract.[6]

_____

[5] Containing exceptions to operation of title, 9 U.S.C. § 1 states:

"Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

[6] The remainder of KRS 417.050 states:

This chapter does not apply to:

Signature contends the Arbitration Agreement is a valid contract that Kenneth represented he had the proper authority to execute and that in fact he provided Signature with a copy of Tommy's POA which granted Kenneth the authority to submit to arbitration "with respect to a claim or litigation." Kenneth disputes that the POA provided such authority. As they did before the trial court and Court of Appeals, Signature and Kenneth advance their arguments by comparing and contrasting *Ping, Clark and Wellner.* We review these cases briefly to provide context for the parties' specific arguments.

In *Ping,* the power of attorney document at issue stated that the principal's daughter-agent,

> Ms. Ping was given authority "to do and perform any, all, and every act and thing whatsoever *requisite and necessary* to be done, to and for all intents and purposes, as I might or could do if personally present, including but not limited to the following: . . ."
>
> The document then specifically authorized several acts pertaining to the management of [the principal's,] Mrs. Duncan's, property and finances . . . . The document also authorized Ms. Ping "[t]o make any and all decisions of whatever kind, nature or type

---

(1) Arbitration agreements contained within the collective bargaining agreements entered into by employers and the respective representatives of member employees;

(2) Insurance contracts. Nothing in this subsection shall be deemed to invalidate or render unenforceable contractual arbitration provisions between two (2) or more insurers, including reinsurers; and

(3) Arbitration agreements entered by any industrial insured captive insurer that is created under the Product Liability Risk Retention Act of 1981, 15 U.S.C. secs. 3901 et seq., as amended.

KRS 417.050 was amended in 2019. 2019 Ky. Acts ch. 75, § 2 amended subsection (1) and 2019 Ky. Acts ch. 166, § 4 created subsection (3). Prior to these amendments, KRS 417.050 was last amended in 1996.

regarding my medical care, and to execute any and all documents, including, but not limited to, authorizations and releases, related to medical decisions affecting me; and [t]o generally do any and every further act and thing of whatever kind, nature, or type *required* to be done on my behalf.

376 S.W.3d at 586-87 (emphasis added). In *Ping*, execution of an arbitration agreement was not a condition of admittance to the long-term care facility where Mrs. Duncan resided. In that context, this Court held that "Mrs. Duncan's power of attorney, properly construed as giving her daughter authority to manage Mrs. Duncan's property and finances and to make health-care decisions on her behalf, did not thereby authorize Ms. Ping to waive, where there was no reasonable necessity to do so, her mother's right of access to the courts." *Id.* at 594.

Five years later, *Clark* was before the United States Supreme Court following this Court's issuance of *Extendicare Homes, Inc. v. Whisman*, 478 S.W.3d 306 (Ky. 2015), deciding three consolidated arbitration cases: *Extendicare Homes, Inc. v. Whisman*, No. 2013-SC-000426-I; *Kindred Nursing Centers Ltd. Partnership v. Clark*, No. 2013-SC-000430-I (*Clark*, No. 2013-SC-000430-I); and *Kindred Nursing Centers Ltd. Partnership v. Wellner*, No. 2013-SC-000431-I (*Wellner*, No. 2013-SC-000431-I). In that 2015 decision, a divided Kentucky Supreme Court held that unless clearly stated in the power of attorney document, an attorney-in-fact does not have authority to bind his principal to a pre-dispute arbitration agreement – a holding now commonly referred to as the clear-statement rule. 478 S.W.3d at 313. Kindred Nursing Centers Limited Partnership sought review of both *Clark*, No. 2013-SC-000430-

11

I, and *Wellner,* No. 2013-SC-000431-I.[7]  The United States Supreme Court then issued the consolidated opinion styled *Kindred Nursing Centers Ltd. Partnership v. Clark,* 581 U.S. ___, 137 S. Ct. 1421 (2017).  The Supreme Court concluded that the clear-statement rule singles out arbitration agreements for disfavored treatment and accordingly violates the FAA.  *Id.* at 1427-28.  Because a majority of this Court had relied solely on the clear-statement rule in concluding that Clark's power of attorney did not grant the agent authority to enter an arbitration agreement, the Supreme Court reversed *Clark,* No. 2013-SC-000430-I.  *Id.* at 1429.  The Supreme Court remanded *Wellner,* No. 2013-SC-000431-I, however, because it was unclear if this Court's decision in that case resulted from application of the clear-statement rule or was premised on other grounds.  *Id.*

The *Wellner* power of attorney provisions at issue were Joe Wellner's grant of 1) the power "to demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor)"; and, 2) the power "to make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance." *Wellner,* 533 S.W.3d at 193.  On remand, this Court, again in a divided opinion, ultimately held that the decision in the 2015 *Whisman* case "that neither of [these] two POA provisions

---

[7] Extendicare Homes, Inc. did not seek review by the United States Supreme Court and the *Whisman* case became final.

relied upon by Kindred gave the agent, Beverly Wellner, the authority to execute on behalf of her principal, Joe Wellner, a pre-dispute arbitration agreement," "was wholly independent of the clear statement rule." *Id.* at. 192, 194.

Signature contends that the Arbitration Agreement is valid because Tommy's POA authorized his attorney-in fact to act on his behalf in "legal actions," including expressly the power to "submit to arbitration, settle, and propose or accept a compromise with respect to a claim or litigation." Kenneth argues that Tommy's POA, unlike many power of attorney documents, provided no broad, general grant of authority, and did not explicitly grant or imply to Kenneth the authority to make health care decisions. He acknowledges, relying on *Ping*, that when authority is granted as to health care decisions that power allows the attorney-in-fact to bind the principal to an arbitration agreement if the principal's admittance to a nursing home is conditioned upon execution of the agreement. Kenneth contends that the POA limited his authority to contract in matters related to Tommy's financial dealings, as reflected in its title "Durable Power of Attorney for Finance of Tommy R. Patton," and as further reflected in Article IV's reference to "assets and liabilities," as well as the enumerated powers being further narrowed under the six subheadings, with only Sections E and F mentioning arbitration. Finally, Kenneth argues that the POA did not authorize him to agree to arbitration *before* a dispute arose. Kenneth contends that Article IV(E), with its language "submit to arbitration, settle, and propose or accept a compromise *with respect to a claim*

13

*or litigation,*" identifies discrete actions the attorney-in-fact can take relative to existing claims and litigation.

In response to Kenneth's contention that Tommy's POA did not authorize him to make health care decisions for Tommy, Signature asserts that the absence of express language addressing health care decision-making is entirely irrelevant because Tommy's POA includes an express grant of authority to submit to arbitration. In addition, however, during oral argument before the circuit court and also argument before the Court of Appeals, Signature, relying on *Ping,* advocated that Article V,[8] granting Tommy's agent broad power to act and make decisions related to Tommy's maintenance and health, is another provision within Tommy's POA which authorized Kenneth to sign the mandatory Arbitration Agreement.

Signature also counters that in light of the United States Supreme Court's invalidation of the clear-statement rule in *Clark,* Kenneth's argument that the POA must specifically grant the authority to enter into a pre-dispute arbitration agreement should be rejected. Kenneth rebuts Signature's *Clark* argument by noting that, as in *Wellner,* Tommy's POA did not encompass pre-dispute language. Kenneth asserts that while *Wellner* supports him, *Ping* is dispositive of the issue whether Tommy's POA granted Kenneth authority to sign a pre-dispute arbitration agreement related to nursing home admission because as in *Ping,* there was no express authority to do so.

---

[8] The parties' briefs to this Court do not explicitly reference Article V when making arguments related to health care or otherwise.

The Court of Appeals, applying *Wellner*'s analysis and the long-standing

principal that a power of attorney document is to be strictly and narrowly

construed, concluded that the only authority Tommy granted Kenneth was

arbitration of existing claims; hence, Kenneth could not agree to arbitrate a

claim on Tommy's behalf before it arose and the Arbitration Agreement was not

enforceable against the Estate's claim. Upon review of Tommy's POA, applying

*Ping*, we agree with Signature that the POA granted Kenneth the authority to

enter into the Arbitration Agreement on Tommy's behalf, but we premise our

holding on Article V, which grants the agent "all powers as are necessary or

desirable to provide for [Tommy's] support, maintenance, [and] health."

The construction of a power of attorney is a question of law, *Ping*, 376

S.W.3d at 590, generally requiring application of the rules for interpretation of

written instruments and the principles governing the law of agency, *see id.* at

590-94. In *Ping*, explaining contract construction principles applicable to a

power of attorney document, this Court stated:

> The scope of [authority is] left to the principal to declare, and
> generally that declaration must be express. In *Rice* [*v. Floyd*, 768
> S.W.2d 57, 59 (Ky. 1989)], this Court explained that even a
> "comprehensive" durable power would not be understood as
> implicitly authorizing all the decisions a guardian might make on
> behalf of a ward. Rather, we have indicated that an agent's
> authority under a power of attorney is to be construed with
> reference to the types of transaction expressly authorized in the
> document and subject always to the agent's duty to act with the
> "utmost good faith." *Wabner* [*v. Black*, 7 S.W.3d 379, 381 (Ky.
> 1999)]. This is consistent with section 37 of the *Restatement
> (Second) of Agency*, which provides that
>
> (1) Unless otherwise agreed, general expressions used in
>      authorizing an agent are limited in application to acts done in

15

> connection with the act or business to which the authority primarily relates.
>
> (2) The specific authorization of particular acts tends to show that a more general authority is not intended.

376 S.W.3d at 592. In regard to general expressions, "[u]nless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." *Id.* (quoting *Restatement (Second) of Agency* § 35 (1958)). Furthermore, it is a fundamental rule that a written agreement generally will be construed "as a whole, giving effect to all parts and every word in it if possible." *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986).

Applying these principles to Tommy's POA, we begin with Article V which states in full, "My Agent shall have all powers as are necessary or desirable to provide for my support, maintenance, health, emergencies, and urgent necessities." Clearly, Tommy did authorize his son in succinct and un-mistakeable terms to have and exercise *all* powers "necessary or desirable to provide" for Tommy's "maintenance [and] health."

In *Ping*, this Court decided similarly to other courts, that when a power of attorney document authorizes the agent to make medical care decisions along with related required acts and "the arbitration agreement is not a condition of admission to the nursing home, but is an optional, collateral agreement, . . . [the] authority to choose arbitration is not within the purview of a health-care agency, since in that circumstance agreeing to arbitrate is not a 'health care' decision." 376 S.W.3d at 593 (citations omitted). As Kenneth

16

himself notes, *Ping* also explains in contrast, that when "an agreement to arbitrate is presented to the patient as a condition of admission to the nursing home, courts have held that the authority incident to a health-care durable power of attorney includes the authority to enter such an agreement." *Id.* (citing *Owens v. National Health Corporation*, 263 S.W.3d 876 (Tenn. 2008); *Triad Health Management of Ga., III, LLC v. Johnson*, 679 S.E.2d 785 (Ga. App. 2009)).

Although more succinct in some provisions, Tommy's POA is not unlike the power of attorney document considered in *Ping*. As in *Ping*, Tommy's POA relates expressly to the management of his property and financial affairs and to assuring that decisions regarding his health and maintenance could be made on his behalf. For most of the authority regarding his property and financial affairs, Tommy specifically describes in Article IV certain acts that his agent may perform, but in Article V Tommy generally grants "all powers as are necessary or desirable" related to his "health" and "maintenance." Although Kenneth apparently views Tommy's Article V grant of "all powers as are necessary or desirable to provide for my support, maintenance, health, emergencies, and urgent necessities" as not explicitly granting or implying the authority to make health care decisions, we cannot discern an alternate interpretation of these plain words. Article V unequivocally expresses Tommy's intent to make a comprehensive grant of authority to his son, Kenneth, as his agent, to do what is "necessary or desirable" to provide for Tommy's health and maintenance.

17

Because Tommy granted his agent all powers as are necessary or desirable to provide for his care, which would encompass Tommy's admission into a nursing home when he was no longer able to physically care for himself, and because Signature *required* a facility resident or his agent to agree to arbitration of future disputes, we are presented with a circumstance different from, but acknowledged in, *Ping.* Here, in accordance with *Ping* and its expressed principles of agency, we apply the rule that when an agreement to arbitrate is presented as a condition of admission to a nursing home, unless otherwise agreed, a power of attorney expressing general authority to make necessary health care decisions includes the incidental or reasonably necessary authority to enter that agreement. In light of Kenneth's authority to sign a necessary, non-optional arbitration agreement in order to obtain Tommy's admittance into Signature's facility, we must conclude the Arbitration Agreement is valid and enforceable. Thus, we find *Ping*'s guidance dispositive of this issue, albeit not in Kenneth's favor.

Although we find Article V of the POA dispositive, Signature asks this Court particularly to interpret Article IV(E) in which Tommy granted his agent authority to "submit to arbitration, settle, and propose or accept a compromise with respect to a claim or litigation." Signature argues this provision does not prohibit Kenneth from entering into a pre-dispute arbitration agreement and further asserts the Court of Appeals' decision misapplied *Wellner* and violated *Clark*'s prohibition of the clear-statement rule. Given our holding as to Article V, which plainly authorizes "all powers as are necessary or desirable"

18

pertaining to Tommy's health and maintenance, we need not consider the breadth of Article IV.[9]

Finally, Kenneth raises another challenge to the validity of the Arbitration Agreement which was not raised before the circuit court. Article II of Tommy's POA, entitled "Effectiveness; Effective Immediately," states, "This Power of Attorney shall become effective immediately . . . ." Tommy's signature on the document was notarized on October 17, 2016, but for reasons unknown the date line above Tommy's signature states, "Dated this 17th day of October, 2017," the underlined elements being handwritten. Given that Tommy died on March 18, 2017, it is readily apparent that he did not sign and date the POA in October of 2017. Nevertheless, Kenneth argues that the POA was not effective when he signed the Arbitration Agreement with Signature in February 2017.

Kenneth's argument asserting the alleged date discrepancy appearing on the face of the POA document was not made in the trial court. The trial court gave no basis for its ruling, but without findings of fact, the record below does not support the argument Kenneth asserts on appeal. *See Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky. 2009) (holding that an appellate court may affirm a lower court on any basis supported by the record). More fact-finding is required to analyze Kenneth's claim that the POA document was void, and fact-finding is beyond this Court's function. Although Kenneth, as the appellee,

---

[9] We note that the Concurring Opinion addresses Article IV's provision for submitting to arbitration "a claim or litigation" on behalf of the principal, Tommy Patton, and finds therein a second basis for Kenneth's authority to execute the Arbitration Agreement.

19

does not have the same issue-preservation burden as Signature had when attempting to reverse the trial court's judgment, we decline to exercise our discretion to consider Kenneth's novel argument on appeal, an argument requiring additional fact finding and likely raising new responsive legal arguments from Signature, matters that could and should have been raised in the trial court. *Cf.*, *Kentucky Farm Bureau Mut. Ins. Co. v. Shelter Mut. Ins. Co.*, 326 S.W.3d 803, 812 n.3 (Ky. 2010) (addressing a novel issue on appeal that was solely legal in nature).

## II. The Arbitration Agreement is enforceable and valid as to Kenneth Patton's individual wrongful death claim.

Kenneth, as Administrator of the Estate of Tommy Robert Patton, initiated this suit by filing a complaint alleging negligence and wrongful death.[10] The Court of Appeals held that any wrongful death claim asserted by Kenneth on his own behalf is subject to arbitration under the Arbitration Agreement. Challenging the Court of Appeals' decision as erroneous, Kenneth presents four arguments in support of his claim that he should not be required to arbitrate his individual wrongful death claim. Signature counters that the Court of Appeals correctly decided this issue because Kenneth signed the Arbitration Agreement in both his representative and individual capacities. We address Kenneth's arguments in turn.

---

[10] As explained in *Ping*, 376 S.W.3d at 597-98, a personal injury or negligence claim belongs to a decedent's estate under the survival statute, KRS 411.140, while a wrongful death action is recognized by the Kentucky Constitution and authorized by KRS 411.130, in favor of certain designated beneficiaries of the decedent.

20

### A. A fair reading of the complaint reflects that the surviving beneficiaries are suing for wrongful death.

Kenneth first asserts that contrary to the Court of Appeals' conclusion, he brought suit solely in his capacity as Administrator of Tommy's Estate, not in his own individual capacity, and consequently, the Court of Appeals considered a non-justiciable matter. He does not acknowledge that the complaint, which expressly asserts "NEGLIGENCE/WRONGFUL DEATH," also encompasses a wrongful death claim as authorized by KRS 411.130. We must disagree with Kenneth's proposed construction of the complaint.

In Kentucky, except in two circumstances not pertinent here,[11] a wrongful death lawsuit must be brought in the name of the personal representative of an estate. KRS 411.130(1); *see also* CR[12] 17.01; CR 24.01(1).[13] The personal representative is only a nominal party but he or she is the party expressly selected by the General Assembly to act on behalf of the individual statutory beneficiaries. *Pete v. Anderson*, 413 S.W.3d 291, 297-99

---

[11] The exceptions are when the personal representative has refused to file the action and when there is fraud or collusion between the personal representative and the alleged wrongdoer. *Louisville & N.R. Co. v. Turner*, 162 S.W.2d 219, 221 (Ky. 1942); *Vaughn's Adm'r v. Louisville N.R. Co.*, 179 S.W.2d 441, 445 (Ky. 1944).

[12] Kentucky Rule of Civil Procedure.

[13] CR 17.01: "Every action shall be prosecuted in the name of the real party in interest, but a personal representative, . . . or a person expressly authorized by statute to do so, may bring an action without joining the party or parties for whose benefit it is prosecuted. . . ."

CR 24.01(1): "Upon timely application anyone shall be permitted to intervene in an action . . . (b) when the applicant claims an interest relating to the property or transaction which is the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless that interest is adequately represented by existing parties."

(Ky. 2013). Over seventy-five years ago, in *Vaughn's Adm'r,* this Court addressed the general outlines of a wrongful death action.

> This action is brought under KRS 411.130, which gives a cause of action to a personal representative for the sole benefit of named beneficiaries. . . . The substance of the present action is that the surviving beneficiaries are suing, since they only are entitled to the benefit of a recovery. The statutory authority of the administrator, where the decedent leaves any of the kindred named in the statute, is to sue for the benefit of the next of kin. The administrator is merely a nominal plaintiff. The real parties in interest are the beneficiaries whom he represents.

179 S.W.2d at 445. "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different; and parties nominally different may be, in legal effect, the same." *Id.* (internal citations omitted).

Here, Kenneth as the Administrator of Tommy's Estate "is merely acting in a representative capacity for [his siblings] and himself, individually" *id.* at 444, in filing a wrongful death action. As to arbitrability of that action, Kenneth was free to enter into an arbitration agreement regarding his own wrongful death claim, *Whisman,* 478 S.W.3d at 314 n.7, and the Court of Appeals properly considered the Arbitration Agreement's impact on the wrongful death claim brought on Kenneth's individual behalf subsequent to Tommy's death. Apparently other individuals are also entitled to assert wrongful death claims following Tommy's death, *e.g.,* Kenneth's siblings, and while the complaint is sufficient to assert their claims, those individuals are not bound by the Arbitration Agreement which Kenneth signed in his individual capacity. *See Ping,* 376 S.W.3d at 597-600.

22

**B. *Ping* does not support Kenneth's position that an individual capacity claim was not brought.**

Kenneth asserts that *Ping* supports his position that by bringing the wrongful death claim in his capacity as the Estate's Administrator, he was not asserting an individual capacity claim. Kenneth points out that like him, Ms. Ping signed a nursing home arbitration agreement as her mother's authorized representative and the agreement reflected that she was related to the resident both as daughter and as power of attorney, *Ping,* 376 S.W.3d at 587, but when Ping brought suit in her representative capacity, no individual capacity claim was asserted. Furthermore, Kenneth contends that although he was free to enter into an arbitration agreement regarding his wrongful death claim, like the daughter-agent in *Ping*, he did not in fact do so because he did not sign the Arbitration Agreement as a "wrongful death claimant."

We cannot agree with Kenneth's reading of *Ping*. First, *Ping* did in fact involve the assertion of both negligence and statutory violation claims on the part of the estate and wrongful death claims on behalf of the survivors. 376 S.W.3d at 588. That decision makes clear, however, that Ping signed the arbitration agreement at issue solely in her capacity as agent under her mother's power of attorney. *Id.* at 596. Ping did not in any way purport to agree to arbitrate her own individual wrongful death claims. *Id.* at 599. Here, in contrast, Kenneth signed the Arbitration Agreement in his individual capacity in addition to signing as his father's authorized representative. *Ping* does not support Kenneth's position because his facts are distinguishable.

23

## C. Signature's prehearing statement does not warrant reversal of the Court of Appeals' decision on the merits.

Kenneth next claims that Signature did not preserve the issue of the arbitrability of his individual capacity claim by including it in Signature's Court of Appeals' CR 76.03 prehearing statement. For this proposition, Kenneth cites *Wright v. House of Imports*, 381 S.W.3d 209, 212-13 (Ky. 2012), which explains the Court of Appeals may consider on appeal only those issues identified in the prehearing statement unless the unpreserved issue would support a finding of palpable error. "[T]he significance of this rule is that the Court of Appeals will not consider arguments to *reverse* a judgment that have not been raised in the prehearing statement or on timely motion." *Id.* at 212 (quoting *Am. Gen. Home Equity, Inc. v. Kestel*, 253 S.W.3d 543, 549 (Ky. 2008); emphasis previously added). Here, Signature's prehearing statement identified the issue to be raised as: "Did the Circuit Court err in denying the motion to compel arbitration? Appellee claims POA did not grant authority to enter into an arbitration agreement. Appellants argue that POA grants attorney-in-fact power to act on resident's behalf in 'legal actions,' including expressly the power to 'submit to arbitration . . . .'"

In *Wright*, House of Imports' prehearing statement identified the issues on appeal as: "Whether the Defendant was entitled to a directed verdict on the issue of liability, or at the very least, an instruction that the Plaintiff was negligent as a matter of law." *Id.* at 212. House of Imports did not succeed on these issues at the Court of Appeals, but instead was successful on an issue not identified in the prehearing statement but nevertheless argued. *Id.* at 213.

24

The successful argument at the Court of Appeals, but not before this Court, was whether the trial court committed palpable error in admitting expert testimony concerning building code violations without instructing the jury as to the applicability of the code. *Id.*

Prior to *Wright*, when considering a deficient prehearing statement argument, this Court stated in *Young v. J.B. Hunt Transportation, Inc.*:

> Without undertaking an exhaustive review of the authorities, we observe that CR 73.02(2) vests considerable discretion in appellate courts to determine the appropriate manner to deal with procedural error and that deciding cases on the merits is a primary objective of appellate procedure. Discerning no unfair prejudice to appellant by the Court of Appeals' consideration of this issue and with due regard for that Court's exercise of its sound discretion, we decline to disturb its decision to reach the issue on the merits.

781 S.W.2d 503, 504 (Ky. 1989) (internal citations omitted).

Signature contends that since the question whether Kenneth's wrongful death claim was subject to the Arbitration Agreement, signed by Kenneth in his individual capacity, was preserved by argument at the circuit court, there was no prejudice or unfair surprise to Kenneth when this specific argument, falling under the broad issue identified in the prehearing statement, was briefed by both parties and the Court of Appeals addressed the argument on its merits. We agree. Although Signature could have presented its arguments with more specificity in the prehearing statement, the argument was clearly preserved in the circuit court and briefed by both parties for the Court of Appeals. As in *Young*, we decline to allow an alleged procedural misstep from which Kenneth suffers no evident unfair prejudice to serve as a reason to disturb the Court of

25

Appeals' holding on the merits that Kenneth's wrongful death claim is subject to arbitration.

### D. Kenneth had reasonable notice that he was signing the Arbitration Agreement in his individual capacity.

Lastly, Kenneth argues that although the Arbitration Agreement states under Kenneth's signature that he is signing in his "individual capacit[y]," that reference cannot bind him individually. Citing *Dixon v. Daymar Colleges Group, LLC,* 483 S.W.3d 332 (Ky. 2015), Kenneth asserts that terms that come after or under a signature are typically not considered part of an agreement. In *Dixon,* this Court held an arbitration agreement between students and a for-profit college was unenforceable, lacking an expression of assent by the students when the arbitration terms on the back of the page were not incorporated by reference in language above the signature. *Id.* at 345-46. Kenneth claims that like in *Dixon,* there is no clear indication in the document above his signature that he understood or assented to sign it in his individual capacity, and thus the Arbitration Agreement is not enforceable against him. He further contends that he did not receive any consideration for signing the agreement in his individual capacity.

Signature counters that the facts of this case are different from *Dixon.* Signature contends the language identifying the capacity in which Kenneth signed the Arbitration Agreement is an element of the signature line itself, not a contract term. And unlike in *Dixon,* where the arbitration provisions at issue were on the back of a contract that was signed only on the front page, Kenneth had reasonable notice that he was signing a mandatory arbitration agreement

26

in both individual and representative capacities and cannot reasonably argue that he did not assent to doing so.

We agree with Signature that this is not a case like *Dixon* in which the signature line's position calls into question whether the signee understood terms following it were incorporated into the agreement. This case instead involves well-settled principles of contract law.

> It is the settled law in Kentucky that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud.

*Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky. 2011) (quoting *Clark v. Brewer*, 329 S.W.2d 384, 387 (Ky. 1959)). Consequently, a person is presumed to know those things which reasonable diligence on his part would bring to his attention. Since Kenneth presents no evidence that Signature attempted to conceal the signature line notation, deceive him, or fraudulently induce him to sign the Arbitration Agreement, we must also reject this argument that he did not sign the agreement in his individual capacity. Lastly, in regard to Kenneth's lack of consideration argument we reiterate that "an arbitration clause requiring both parties to submit equally to arbitration constitutes adequate consideration." *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) (quoting *Kruse v. AFLAC Intern., Inc.*, 458 F. Supp. 2d 375, 385 (E.D. Ky. 2006)).

Upon consideration of Kenneth's arguments, we conclude the Arbitration Agreement is binding on Kenneth individually. The Court of Appeals correctly

27

held that his wrongful death claim is subject to arbitration and we affirm that portion of the appellate court's opinion.

For the foregoing reasons, we affirm in part and reverse in part the Court of Appeals' opinion rendered in this case. We remand this case to the Jefferson Circuit Court for entry of an order compelling arbitration consistent with this Opinion.

Minton, C.J.; Lambert, and VanMeter, JJ., concur. Keller and Wright, JJ., concur in result only. Nickell, J., not sitting.

HUGHES, J., CONCURRING: Just as two roads can lead to the same destination, two separate provisions in a legal document can require the same conclusion. As author of the majority opinion, I fully agree that the Article V broad grant of "all powers as are necessary or desirable to provide for my support, maintenance, [and] health" empowered Kenneth to sign the mandatory Arbitration Agreement on behalf of his father. That simple, direct route dictates our conclusion that the Estate's claims are arbitrable. Nevertheless, I also firmly believe that the language in Article IV, Section E, 1 and 5 of Tommy's POA, quoted in the majority opinion, authorized Kenneth to agree to arbitrate the Estate's claims. I strongly dissented in *Kindred Nursing Centers Ltd. Partnership v. Wellner*, 533 S.W.3d 189 (Ky. 2017), and continue to believe that the 4-3 majority wrongly decided that case. However, even under *Wellner* nothing prevents a finding that the Article IV authorization to submit

28

"a claim" to arbitration granted Kenneth the power to sign the Arbitration Agreement.

In *Wellner*, the agent was authorized to pursue any existing or future claim on behalf of the principal, including through litigation, and also to execute contracts relating to the principal's "real and personal property." The power of attorney document did not contain any specific reference to arbitration, but the long-term care facility insisted that the power of attorney, especially the power to contract, included the authority to enter into an arbitration agreement for any dispute that might arise in the future. Focusing on the precise language of the instrument, the majority held:

> At this point it is worth recalling that the "act" of Wellner's agent which required authorizing language from the POA document was not the enforcement, through legal proceedings or otherwise, of something then due or to become due to Joe Wellner; nor was it the making of a contract or instrument pertaining to any of Joe Wellner's property. The "act" that required authorization was signing an agreement which makes no reference at all to Joe's property and instead pertains exclusively to his constitutional rights [to a jury trial].
>
> . . . .
>
> Kindred's pre-dispute arbitration contract did not relate to any property rights of Joe Wellner. It did not buy, sell, give, trade, alter, repair, destroy, divide, or otherwise affect or dispose of in any way any of Joe Wellner's personal property. By executing Kindred's pre-dispute arbitration agreement, Beverly did not "make, execute and deliver deeds, releases, conveyances and contracts of [any] nature in relation to [Joe's] property." The only "thing" of Joe Wellner's affected by the pre-dispute arbitration agreement was his constitutional rights, which no one contends to be his real or personal property.

29

*Id.* at 192, 194. By contrast, the power of attorney document before us pertains specifically to authority to submit to arbitration "a claim" on behalf of the principal. It is not a general power to contract clause with limiting language on which a distinction can be drawn between contracts respecting real and personal property rights *vis-a-vis* contracts regarding constitutional rights, the foundation on which *Wellner* is built. Instead, Article IV, Section E of Tommy's POA expressly authorizes Kenneth to "submit to arbitration, settle and propose or accept a compromise with respect to a claim or litigation." This section empowers Kenneth to agree to arbitrate *any* claim, whatever it pertains to and whenever it may arise, and thus provides an independent basis for concluding the Arbitration Agreement is enforceable.

Minton, C.J.; and VanMeter, J., join.

COUNSEL FOR APPELLANTS/CROSS-APPELLEES:

John David Dyche
Leigh Vandiver Graves

COUNSEL FOR APPELLEE/CROSS-APPELLANT:

Vanessa B. Cantley
Patrick E. Markey